**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | |
| **v.** | **)** | **Criminal No. 12-70 Erie** |
| | **)** | |
| **ZAVIA JOHNSON** | **)** | |
| **a/k/a Lester Hayes** | **)** | |
| **a/k/a Xavier Johnson** | **)** | |

## OPINION and ORDER ON MOTION TO SUPPRESS

Defendant Zavia L. Johnson, *aka* Lester Hayes, *aka* Xavier Johnson, is charged in a one-count indictment with possession with intent to distribute 100 grams or more of Heroin in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(i). The indictment arose out of a traffic stop conducted by Trooper Gary S. Knott of the Pennsylvania State Police of a vehicle driven by the Defendant on November 2, 2012. During the course of the traffic stop, Trooper Knott was joined by Corporal Brian Peters of the Pennsylvania State Police who arrived at the stop with his drug detection dog, Iggy. A search warrant was obtained to search Defendant's vehicle after Iggy alerted for the presence of drugs. Presently before the Court is Defendant's Motion to Suppress Evidence Obtained as the Result of an Unlawful Search and Seizure (ECF No. 22), and a Supplemental Motion raising a <u>Franks</u> issue (ECF No. 31).

A hearing was held on two separate days, May 20, 2014, and June 26, 2014. During the first hearing testimony was presented from Trooper Knott and Corporal Michael T. Ruhf of the Pennsylvania State Police, who, among other things, is a certified canine handler whose responsibilities include training and certifying canine teams. During the second hearing date we heard testimony from Corporal Peters and from Jerry Phillips, a private investigator, who

presented testimony and evidence concerning certain measurements along the highway where the traffic stop occurred.  For the reasons set forth below we will deny Defendant's motion.

## I.  Background

On November 2, 2012, Trooper Gary S. Knott of the Pennsylvania State Police was traveling in a marked police cruiser on Interstate 90 ("I-90"), when he was asked to assist with a report of a vehicle driving erratically and traveling northbound on Interstate 79 ("I-79") in Erie County.   Tr. Supp. Hrg, May 20, 2014, at 9.  In response, Trooper Knott quickly drove his vehicle to the clover leaf where I-90 and I-79 intersect, got on I-79 heading southbound, and moved into the left hand passing lane so he could travel as fast as possible in response to the report of the erratic driver.  Tr. 5/20/14, at 10-11.

While traveling in the passing lane, Officer Knott observed a Nissan Altima ahead of him that continued to maintain its position in the passing lane even though Trooper Knott was quickly approaching.  Tr. 5/20/14, at 12.  The fact that the driver of the Altima appeared not to have noticed Trooper Knott's marked vehicle bearing down on him while traveling in the passing lane gave rise to Trooper Knott's concern that perhaps the driver lacked "situational awareness" and was not aware of his surroundings, thereby creating a potential danger.   Tr. 5/20/14, at 13.  In addition, Trooper Knott testified that it is a violation of the Pennsylvania Vehicle Code to proceed in the left hand lane without a specified permitted purpose.  Tr. 5/20/14, at 13.

Having observed a traffic violation, and concerned for safety on the highway, Trooper Knott moved his vehicle to the right hand lane and pulled up beside the Altima to see if he could visually determine if there was a secondary cause for the driver's apparent distraction.  Tr. 5/20/14, at 12, 14.  Trooper Knott testified that when he pulled up parallel to the vehicle he

observed that the driver "looked over at me and immediately he went from a slouched position very casually and he jumped and grabbed the steering wheel with two hands, and that caused his vehicle to veer to the left on top of the fog line on the left side of the road." Tr. 5/20/14, at 14-15.

Trooper Knott than slowed down and "began to back off", which allowed the driver of the Altima to activate his turn signal and move into the right lane in front of Trooper Knott's vehicle. Tr. 5/20/14, at 15. Trooper Knott felt that the driver's maneuver into the right hand lane directly in front of him was hazardous due to windy and rainy conditions and a wet roadway. Tr. 5/20/14, at 15. Trooper Knott estimated that there was approximately only one car length between the Altima and his vehicle at the time the Altima changed lanes. Tr. 5/20/14, at 15. Having already observed the driver of the Altima "camped" in the passing lane, which constituted a traffic violation, Trooper Knott activated his overhead lights and conducted a traffic stop. Tr. 5/20/14, at 16, 84.

The traffic stop began at approximately 9:45 a.m. and was recorded by a dashboard video recording device from shortly before Trooper Knott activated his headlights to the conclusion of the stop. The initial stop was prolonged for a number of reasons. First, Trooper Knott testified that when he approached the driver and retrieved identification documents from him he noticed that his hands were trembling and that he displayed a "significantly higher than average" level of nervousness than the average motorist. Tr. 5/20/14, at 19, 20. After introducing himself to the driver and learning that his name was Zavia Johnson, Trooper Knott took Mr. Johnson's New Jersey driver's license and two Dollar Rent-A-Car contract documents back to his vehicle to examine the documents and verify their legitimacy. Tr. 5/20/14, at 20-21.

The traffic stop was also slightly prolonged due to a vehicle pulling off the road some distance behind Trooper Knott when he initially pulled Mr. Johnson over, as well as U-Haul rental truck pulling in front of Mr. Johnson's Altima at a different time during the stop. Trooper Knott's experience and training had taught him that sometimes drug traffickers travel in more than one vehicle to protect each other and he therefore became concerned that this might be the case during this traffic stop. Accordingly, he called for backup assistance to verify what was happening with the other vehicles. In the end, it was determined that neither of the vehicles was related to the traffic stop of Mr. Johnson.

Trooper Knott discovered that the rental contracts had expired in October 2012. Tr. 5/20/14, at 21-22. He then conducted criminal records check on the name appearing on the New Jersey driver's license, Zavia L. Johnson, with a date of birth of January 4, 1969, which revealed that this person's actual name was Lester Hayes. Tr. 5/20/14, at 23. Additional time was therefore needed in order to verify the correct identity of the driver and to verify the legitimacy of his possession of the rental car.

With respect to the rental contracts, Trooper Knott communicated with a dispatcher, who was attempting to verify that the vehicle Mr. Johnson was driving was properly in his possession. This process took a considerable amount of time. Tr. 5/20/14, at 31. During this time, the dispatcher stated to Trooper Knott that Dollar Rent-A-Car was indicating that the vehicle did not belong to them. Tr. 5/20/14, at 31. Trooper Knott asked Mr. Johnson about the expired rental contracts. Tr. 5/20/14, at 37. Mr. Johnson explained that due to Hurricane Sandy he was unable to get to the rental company to renew his contract, but he also explained that he only needed to telephone Dollar Rent-A-Car to extend his rental. Tr. 5/20/14, at 37-38. Approximately, 48

minutes into the stop, Trooper Knott received verification from Dollar Rent-A Car, via his dispatcher, that the Altima was their vehicle, that Mr. Johnson validly possessed it, but that he had not renewed it, although he did have the ability to renew the vehicle by telephone. Tr. 5/20/14, at 39, 47-48.

With respect to verifying Mr. Johnson's identity, Trooper Knott learned that Lester Hayes had a criminal record. Tr. 5/20/14, at 32-33. He also discovered that Lester Hayes was associated with eleven different aliases. Tr. 5/20/14, at 32-33. The criminal record included weapons-related charges, distribution and possession of controlled substances, aggravated assault, kidnapping, sexual assault, and other charges. Tr. 5/20/14, at 33-34. Thus, Trooper Knott had information indicating that Mr. Johnson had used several different aliases and that he had a significant criminal record.

Based on the events that occurred during the initial stages of the traffic stop raising Trooper Knott's suspicion that Mr. Johnson may be involved in criminal activity, he had requested assistance from Corporal Peters and his drug detection dog Iggy. Once Corporal Peters arrived on the scene, Trooper Knott told him that Mr. Johnson's appeared to have several aliases and a criminal record. Tr. 5/20/14, at 44; Supp. Hrg Tr. June 26, 2014, at 18-19. Corporal Peters, by himself, asked Mr. Johnson if he had used other names in the past. Tr. 5/20/14, at 44; Supp. Hrg Tr. June 26, 2014, at 19-20. Mr. Johnson denied that he had used aliases, and said that his name was Zavia Johnson. Tr. 5/20/14, at 44, 50-51; Tr. 6/26/14, at 20-21.

Mr. Johnson initially told Trooper Knott that he was traveling to Pittsburgh to purchase a pair of alligator skin boots on Penn Avenue. Tr. 5/20.14, at 40. Later, when Corporal Peters

asked Mr. Johnson about his travel plans, Mr. Johnson told him that he had several businesses, including one in Rochester, New York where he was coming from, that he traveled extensively, and that he had family in Pittsburgh. Tr. 5/20/14, at 44; Tr. 6/26/14, at 21-22. Trooper Knott believed it to somewhat suspicious that Mr. Johnson would initially tell him that he was traveling to Pittsburgh to purchase a specific kind of boot, but failed to mention this purpose at all to Corporal Peters. Tr. 5/20/14, at 44-45; Tr. 6/26/14, at 22.

About one hour into the traffic stop, and after Corporal Peters had arrived and spoken with Mr. Johnson, Trooper Knott decided to inform Mr. Johnson that he suspected that criminal activity was occurring. Tr. 5/20/14, at 48. He therefore had Mr. Johnson exit the vehicle and read him his Miranda rights. Tr. 5/20/14, at 48. Trooper Knott then told Mr. Johnson that he knew that Mr. Johnson had used aliases in the past and that he had also discovered that Mr. Johnson had a lengthy criminal record. Tr. 5/20/14, at 49-50. At that point, Mr. Johnson admitted that he had used different names in the past and relayed a few of those names to the Trooper, which confirmed to Trooper Knott that Mr. Johnson was in fact the person associated with the criminal record he initially received based on Mr. Johnson's identifying information. Tr. 5/20/14, at 50.

Trooper Knott then asked Mr. Johnson if he could have permission to search the vehicle, and Mr. Johnson refused. Tr. 5/20/14, at 51. Trooper Knott then informed Mr. Johnson that Corporal Peters and his drug detecting dog were going to conduct a scan of the vehicle. Tr. 5/20/14, at 51; Tr. 6/26/14, at 22. Corporal Peters brought Iggy towards the car to conduct a scan. Corporal Peters testified that before he and Iggy had reached Mr. Johnson's vehicle, Iggy's "head was raised, his mouth closed, he was sniffing, his head was drifting back and forth, we call

that air scenting, which was my first observation of alert behavior." Tr. 6/26/14, at 24. Iggy did not "indicate', that is, locate the source of the odor, but Corporal Peters considered Iggy's reaction to be a positive response to the presence of a controlled substance that he is trained to detect. Tr. 5/20/14, at 55; Tr. 6/26/14, at 24, 26-27.

Having been informed that Iggy had alerted to the presence of drugs, and in light of all the other indicators he had observed, Trooper Knott thus determined that he had probable cause to search the vehicle, decided to seize the vehicle, and apply for a search warrant. Tr. 5/20/14, at 56. A tow truck arrived at approximately 1 hour and 37 minutes into the traffic stop with the plan that it would be towed to the Edinboro Police Department, which was the nearest facility that would allow Trooper Knott to apply for a search warrant and conduct the search. Tr. 5/20/14, at 56-57. Trooper Knott explained to Mr. Johnson that he was free to go and that he would drive him to wherever he wanted so that he could continue on with his travel. Tr. 5/20/14, at 57. Mr. Johnson decided that he would have Trooper Knott drop him off at a Greyhound bus station. Tr. 5/20/14, at 59-60.

After dropping Mr. Johnson off at the bus station, Trooper Knott returned to the Edinboro Police Station around 12:30 p.m. where he was told that the magistrate judge with whom he had intended to apply for a search warrant was not going to be available until 4:00 or 4:30 in the afternoon. Tr. 5/20/14, at 60, 61. Trooper Knott was unable to leave the Altima at the Edinboro Police location because it would not be in a secure area accessible only by law enforcement. Tr. 5/20/14, at 62. Therefore, he contacted his supervisors (an evidence custodian and a vice and narcotics unit supervisor) who instructed him to conduct an inventory search of the vehicle as

required by department policy. Tr. 5/20/14, at 63. Among other items, Trooper Knott found a large bundle of United States currency and bricks of heroin. Tr. 5/20/14, at 65.

Because he had found evidence of a crime, Trooper Knott sought further guidance from his patrol unit supervisor, who instructed him to have the vehicle towed to the Pennsylvania State Police Barracks at Lawrence Park. Tr. 5/20/14, at 67-68. He then returned to the Greyhound bus station and arrested Mr. Johnson. Tr. 5/20/14, at 69.

Trooper Knott completed an Application for Search Warrant to search the Altima with a 5-page supporting Affidavit of Probable Cause. Gov. Ex. 5. He presented it to the magistrate judge in North East, Pennsylvania, and obtained a search warrant. Tr. 5/20/14, at 68. A search of the vehicle revealed, among other items, 175 bricks of heroin and $7,000 in United States currency. Tr. 5/20/14, at 72-73.

## II. Discussion

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizure, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV. The Fourth Amendment of the United States Constitution protects against unreasonable searches and seizures. Evidence obtained through a search that violates a defendant's Fourth Amendment rights will be suppressed. U.S.C.A. Const. Amend. 4; see also Segura v. U.S., 468 U.S. 796, 804 (1984) (noting that "evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion"). When a search and seizure is done without a warrant, it is the government's burden to show that the search was reasonable.

U.S.C.A. Const. Amend. 4; see U.S. v. Austin, 269 F.Supp. 2d 629, 631 (E.D. Pa. 2003) (citing United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (quotations omitted)).

Mr. Johnson first argues that Trooper Knott did not have probable cause or reasonable suspicion in the first instance to believe that a traffic violation had occurred. Next, he argues that his continued detention after the purpose of the initial traffic stop had been completed was improper and unsupported by reasonable suspicion or probable cause. Mr. Johnson also argues that the seizure of his vehicle is similarly unsupported by probable cause.

Next. Mr. Johnson also argues that probable cause to search his vehicle did not exist based on any conduct of the drug detection canine, Iggy, because Iggy neither indicated a location of drugs nor alerted to the odor of drugs. Additionally, Mr. Johnson argues that the subsequent inventory search of his vehicle was unlawful as not being supported by probable cause or a search warrant, and that the inventory search exception does not apply to the circumstances of this case, and was instead performed as a pretext for an investigatory search.

Finally, Mr. Johnson argues that the Affidavit of Probable Cause was materially misleading and contained deliberately or recklessly false statements in light of the material available to Trooper Knott at the time he submitted the Affidavit of Probable Cause thereby rendering the search warrant invalid under Franks v. Delaware, 438 U.S. 154, 155-56 (1978).

As explained below, we find that the initial traffic stop was justified based on the Trooper's observation of a traffic violation, and that the prolonged length of the stop was reasonable. We also find that the Corporal Peters' drug detection canine Iggy alerted to the presence of drugs in the vehicle. We further find that Trooper Knott had probable cause to seize and search the vehicle at the point when he learned that Iggy had alerted to the presence of drugs.

We also find that while a ruling on Trooper Knott's subsequent inventory search of the vehicle is unnecessary, it nevertheless was proper.  Finally, we find that probable cause did exist for the issuance of the search warrant, and that there was no <u>Franks</u> violation.

**A.  The Initial Traffic Stop**

Mr. Johnson argues that Trooper Knott never had probable cause to stop Mr. Johnson in the first place because it is objectively clear that Mr. Johnson did not violate any traffic laws. Specifically, Mr. Johnson argues that the dashboard video demonstrates that he did not, as alleged by Trooper Knott, violate 75 Pa.C.S. § 3313(d)(1), by riding in the left hand lane.  He argues that the video shows that he was in the left hand lane for a valid reason under Pennsylvania law, namely, to allow traffic to merge from Intestate 90 onto Interstate 79.  He further argues that he had to maintain his position in the left hand lane after allowing traffic to merge because Trooper Knott's vehicle was in the right hand lane making it impossible for him to move into the right hand lane.

In addition to the lawfulness of Mr. Johnson's presence in the left hand lane, he also argues that Trooper Knott effectuated the traffic stop based on intentional misrepresentations and outright fabrications.  D. Br. 4.   Mr. Johnson takes issue with Trooper Knott's conduct after he had observed that a traffic violation had occurred.  According to Mr. Johnson since the Trooper believed he saw a violation of the traffic code he should have effectuated the stop but instead he chose to move into the right hand lane and pull alongside Mr. Johnson's vehicle.  The insinuation appears to be that Trooper Knott was solely looking for evidence of drug trafficking well before he stopped the car.  Mr. Johnson also contends that Trooper Knott's testimony that Mr. Johnson became obviously startled when Trooper Knott pulled alongside his vehicle and Mr. Johnson

jerked the wheel to the left causing him to possibly drive on top of the fog line is not truthful. Finally, Mr. Johnson suggests that Trooper Knott was also untruthful or intentionally misrepresenting the facts when he testified that when Mr. Johnson moved his vehicle into the right hand lane in front of the Trooper he did so in an unsafe and imprudent manner.

In <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968), the Supreme Court held that a brief investigatory warrantless search, based on less than probable cause, is permissible under the Fourth Amendment where a police officer has a reasonable, articulable suspicion that criminal activity is afoot. <u>Terry</u>, 392 U.S. at 30; <u>see</u> <u>also</u> <u>U.S. v. Yamba</u>, 506 F.3d 251, 255 (3d Cir. 2007). "[W]hen an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop" the stop will be deemed reasonable. <u>United States v. Delfin-Colina</u>, 464 F.3d 392, 397 (3d Cir. 2006).

We have reviewed the dashboard video and Trooper Knott's testimony. We conclude that it is clear that Trooper Knott's initial stop of Mr. Johnson was authorized because the Trooper observed a traffic violation. The traffic violation here was Mr. Johnson driving in the left hand passing lane in violation of 75 Pa.C.S. § 3313(d)(1). The video recording did not record the time period when Trooper Knott first observed Mr. Johnson's vehicle in the left hand lane, nor did it record the time period when Trooper Knott was increasing his speed in the left hand lane and realizing that the vehicle in front of him was not moving out of his way to allow the Trooper to pass.

Our review of the dashboard video does not provide evidence to support Mr. Johnson's assertion that he was in the left hand lane to allow another vehicle to merge onto Interstate 79. The video shows that there is a vehicle in the right hand lane at a significant distance ahead of Mr. Johnson's vehicle and this vehicle is not merging onto Interstate 79. The video also shows that no other vehicles were merging onto the Interstate and thus there was no need for Mr. Johnson to be in the left hand lane to allow any vehicle to merge. Therefore, Trooper Knott's decision to stop the vehicle based on a violation of the traffic code was valid.

In addition, we see nothing nefarious about Trooper' Knott's decision to pull alongside the vehicle before effectuating the stop. Trooper Knott testified that by the time he had pulled alongside Mr. Johnson he had already determined that there had been a violation of the traffic code. Tr. 5/20/14, at 84. He further testified credibly that he did so, in part, to determine why the driver was so distracted. Tr. 5/20/14, at 85. In addition, he testified that before stopping a vehicle he prefers to determine how many occupants are in the vehicle, whether there are children present, and to visually identify the occupants of the vehicle. In case the driver decided to flee such information could guide his future actions, or allow him to identify the occupants of the vehicle. Tr. 5/20/14, at 85.

**B. Prolonged Length of the Traffic Stop**

Mr. Johnson correctly states that once the "purposes of a traffic stop are completed an officer cannot detain the vehicle or its occupants unless something occurred that caused the officer to have reasonable suspicion that criminal activity was afoot." D. Br. 6, citing United States v. Richardson, 385 F.3d 625, 629 (6th Cir. 2005). However, he argues that in this case, "except for the alleged nervousness of Mr. Johnson, and the fact that he had a criminal record and previously

used aliases, the indicators expressed by Trooper Knott in support of criminal activity are merely

subjective interpretations made by Trooper Knott and not supported by fact or evidence." D. Br.

14. Mr. Johnson addresses each paragraph of Trooper Knott's police report attacking each

individual indicator of criminal activity identified by the Trooper and concludes that, except for

the above indicators of criminal activity, they are solely based on the Trooper's own

interpretation and in some cases the indicators are absurd. D. Br. 7.

     An "officer must have a particularized and objective basis for believing that the particular

person is suspected of criminal activity." Id.; see also United States v. Cortez, 449 U.S. 411,

417-18 (1981). Deference is given to the officer's conclusions based on his or her experience.

Id.; see also United States v. Rickus, 737 F.2d 360, 365 (3d Cir. 1984) (citing Cortez, 449 U.S. at

418). Moreover:

> in determining whether the officer acted reasonably in such circumstances, due
> weight must be given, not to his inchoate and unparticularized suspicion or
> 'hunch,' but to the specific reasonable inferences which he is entitled to draw from
> the facts in light of his experience.

Terry, 392 U.S. at 27 (citing Beck v. State of Ohio, 379, U.S. 89, 91 (1964)). In evaluating the

reasonableness of a stop and frisk, the Court will look at the totality of the circumstances. U.S.

v. Valentine, 232 F.3d 350, 353 (citing U.S. v. Sokolow, 490 U.S. 1, 8 (1989) (citations omitted).

An officer's "experience and specialized training may allow them to make inferences and

deductions from information that might well elude an untrained person." Id. (citing United

States v. Arvizu, 534 U.S. 266, 273 (2002) (quotations omitted)). "A reasonable suspicion of

criminal activity may be formed by observing exclusively legal activity." U.S. v. Ubiles, 224

F.3d 213, 217 (3d Cir. 2000) (citing Wardlow, 528 U.S. at 125). In evaluating whether a Terry

stop was reasonable under the totality of the circumstances, there are several pertinent factors.

Specifically, "'nervous, evasive behavior is a pertinent factor in determining reasonable suspicion'" U.S. v. Nelson, 284 F.3d 472, 477 (3d Cir. 2002) (quoting Illinois v. Wardlow, 528 U.S. 119, 124 (2000)).  Likewise, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." Id. (quoting Wardlow, 528 U.S. at 124).

Mr. Johnson has chosen not to address the totality of the circumstances testified to by Trooper Knott, instead choosing to build his argument on a separate point-by-point refutation of individual pieces of Trooper Knott's testimony.  By choosing not to present an argument that addresses all of Trooper Knott's testimony together, under the totality of the circumstances, Mr. Johnson fails to present a convincing argument as to why the traffic stop was unreasonably prolonged   It is not difficult to see why Mr. Johnson has chosen this approach: to view all Trooper Knott's testimony regarding his observations of what he saw as indicators of criminal activity under the totality of the circumstances shows that the traffic stop, although lengthy, was reasonably prolonged.

When Trooper Knott initially pulled over the vehicle he already was concerned because the driver apparently did not notice that a police vehicle was gaining on him as he travelled in the left hand lane.  Trooper Knott then began the process of investigating the validity of Mr. Johnson's identity and of his possession of the rental.  Each of these processes was necessary and reasonable and naturally prolonged the stop.

With regard to Mr. Johnson's identity, the check of his driver's license revealed that his name was in reality Lester Hayes, and that Zavia Johnson was an alias.  In addition, a criminal background check showed that "Lester Hayes" had a significant criminal history.  Thus, Trooper

Johnson had a valid reason to conduct further inquiry into the identity of the individual he had stopped. In addition, discovering that the driver of the vehicle had used several aliases and had a criminal record were factors that contributed to Trooper Knott's suspicion that criminal activity was afoot and required that the Trooper proceed cautiously and continue to investigate.

The rental contracts were expired, and although eventually it was verified that Mr. Johnson was lawfully in possession of the vehicle, that did not occur until Trooper Knott was able to verify this fact for himself, with the assistance of a dispatcher, after a significant amount of time had passed.

In addition, Trooper Knott testified that when Mr. Johnson gave him the documents his "hands were trembling so severely that he was nearly dropping the documents." Tr. 5/20/14, at 19. He further testified that the level of nervousness displayed by Mr. Johnson was more severe than in a usual encounter, and it did not dissipate as the encounter proceeded. Tr. 5/20/.15, at 19-20.

Trooper Knott also testified that he noticed a very strong odor of an artificial fragrance present inside the car significantly greater than most vehicles" that persisted for hours after the initial stop. Tr. 5/20/14, at 28, 30. In his experience, Trooper Knott testified that drug traffickers use fragrances in order to mask the smell of drugs and to otherwise thwart identification of the odor of drugs. Tr. 5/20/14, 29.

Again, based on his experience, Trooper Knott was aware that drug traffickers often travel in pairs, and when an automobile pulled over behind where the stop occurred, and a U-Haul truck had pulled in front of where the stop occurred, these facts were considered by Trooper Knott as possibly indicators of criminal activity. Of course it turned out that neither

vehicle was involved with Mr. Johnson, but the Trooper's reasonable consideration of these events added to the length of the stop.

In addition to the above, Trooper Knott observed several facts that were in themselves not indicative of criminal activity but based on his experience, when considered together with other facts he had learned raised a suspicion that Mr. Johnson might be engaged in criminal activity, specifically drug trafficking. These facts included the use of two cell phones; an apparent travel origination point from Newark, New Jersey, a known source city for heroin; the lack of visible luggage in the interior of the vehicle considering the length of time Mr. Johnson had been traveling; telling Trooper Knott that he was traveling to Pittsburgh to buy alligator boots on Penn Avenue and then later telling Corporal Peters that he had family in Pittsburgh, and that he operated businesses in several places (including Rochester, New York) but not telling him that his reason for travel was to buy alligator boots in Pittsburgh.

Mr. Johnson had also denied using aliases, even though Trooper Knott had already determined that the identification Mr. Johnson had given him demonstrated that he had in fact used aliases. It was not until Trooper Knott confronted him with evidence of the other aliases that Mr. Johnson finally admitted it.

Our review of the evidence and testimony shows that Trooper Knott had articulable, reasonable suspicion to suspect that criminal activity was afoot. The steps taken by Trooper Knott to further investigate Mr. Johnson's identity, to verify the rental contracts, and to call for the drug detection unit are all reasonable activities that contributed to the prolonged length of the stop, but we cannot say that the length of this stop was unreasonable in light of the totality of the circumstances.

It is apparent from defense counsel's cross-examination, as well as the briefs filed by defense counsel, that Mr. Johnson is arguing, in part, that Trooper Knott had already concluded that he had a drug trafficker when he first saw a black man driving a vehicle with a New Jersey license plate. Thus, Mr. Johnson argues that thereafter Trooper Knott's conduct was entirely aimed at confirming the conclusion he had arrived at without any supporting information. As a result, Mr. Johnson argues that Trooper Knott had a distorted interpretation of Mr. Johnson's otherwise innocent and explainable behavior. Seen in this light, Mr. Johnson's argument is reasonable but still unconvincing.

We observed the direct and cross-examination testimony of Trooper Knott and Corporal Peters, and reviewed the transcripts. We have reviewed the dashboard video of the stop and transportation of Mr. Johnson in the backseat of Trooper Knott's vehicle. We have also reviewed the exhibits in this case, including the police report and the affidavit of probable cause in support of the application for a search warrant. We conclude that Trooper Knott's testimony was credible and consistent throughout this case. We do not believe that he had predetermined that Mr. Johnson was engaged in criminal activity but rather he appeared to us to have acted based on the events as they unfolded and acted in a cautious and professional manner as he worked to dispel or confirm his suspicions.

### C.  Probable Cause to Search the Vehicle based on Drug Detection Dog Iggy

Mr. Johnson challenges Trooper Knott's reliance on the drug detection canine team of Corporal Peters and Iggy to support probable cause to search the vehicle. Specifically, he argues that the evidence and testimony demonstrate that Iggy neither "indicated" the location or source of the drugs, nor did Iggy "alert" to the odor of drugs in the vehicle.

An "indication" is a trained response from the dog in which the dog is trained to sit and indicate the location of the source of an odor he is trained to detect. Tr. 5/20/14, at 164-165, 175; Tr. 6/26/14, at 13. An "alert" is an instinctive behavior consisting of changes in behavior, such as a change in body posture and increased respirations, when the dog encounters an odor he is trained to detect. Tr. 5/20/14, at 174-175; Tr. 6/26/14, at 13. There is no dispute about whether Iggy "indicated," as both Corporal Ruhf and Corporal Peters testified that Iggy did not indicate. Tr. 5/20/14, at 203; Tr. 6/26/14, at 26, 37, 51, 53-54, 74.

Thus the only argument is whether Corporal Peters' report that Iggy alerted to the presence of drugs is correct. In support of this argument Mr. Johnson first notes that Corporal Peters testified that Iggy was not trained in alert behavior. With regard to Iggy's behavior on the day of the search, Mr. Johnson points out that Corporal Peters testified that Iggy's alert behavior occurred off camera and prior to the team commencing the search. Mr. Johnson further argues that Corporal Peter's testimony was contradicted by Corporal Ruhf's testimony concerning air scenting and alert behavior. He therefore concludes that because Iggy did not indicate or alert probable cause did not exist for the search.

We disagree with Mr. Johnson's conclusion. Mr. Johnson's argument ignores all but a narrow portion of the extensive testimony and evidence offered by Corporal Ruhf and Corporal Peters that show, among other things, that the drug detection team of Corporal Peters and Iggy has had continual training and multiple certifications on a monthly basis from 2007 through 2012, one that occurred the day prior the incident in this case.[1]

---

[1] Considerable testimony was presented by the government through Corporal Ruhf and Corporal Peters demonstrating the extensive training program and certification process required for drug detection canine teams.

In addition, although both witnesses testified that dogs are not *trained* in alert behavior, they also testified at length about what alert behavior is, what drives it in dogs, and how a handler would be able to recognize alert behavior. Corporal Ruhf testified that a handler is supposed to be able to recognize alert behavior, and is in fact the person who is best capable of recognizing alert behavior. Tr. 5/20/14, at 204, 209, 220. He further testified that alert behavior is a spontaneous reaction to an odor, that drug detection dogs are conditioned to respond to the presence of drug odors, and that the change in behavior in the dog when drugs are detected is different from the dog's ordinary reaction to the presence of other environmental odors. Tr. 5/20/14, at 216, 220. Corporal Ruhf consistently testified that he could not reach a conclusion as to whether Iggy alerted based on the dashboard video.

Corporal Peters testified that even before he started the formal search of the vehicle he had observed alert behavior in Iggy "consistent with his alert to odors he has been trained to detect." Tr. 6/26/14, at 24. He explained that when Iggy encounters an odor he has been trained to detect "his behavior changes, and I'm trained to observe that change in behavior." Tr. 6/26/14, at 34. He testified that alert behavior is instinctual. Tr. 6/26/14, at 48. He explained that when a dog first encounters an odor he is trained to detect there is an increase in his respiration rate and a change of posture. Tr. 6/26/14, at 40. Corporal Peters therefore concluded that Iggy had alerted to the presence of a drug he was trained to detect.

---

In addition, Corporal Ruhf testified at length regarding the background of the program and in detail about specific training processes as well as the certification process. Both Corporals also testified in detail about the training and certification processes that Corporal Peters and Iggy had undergone. All of this testimony was supported by documentary evidence. This testimony was necessary because Mr. Johnson had challenged aspects of the training and certification process and in particular the bona fide nature of Corporal Peters and Iggy as a drug detection canine team. In the end, however, Mr. Johnson chose not to present any testimony to contradict or challenge the testimony and evidence of the Corporals, and instead focuses his challenge solely on the sniff of his vehicle on November 2, 2012.

We do not see any inconsistency between Corporal Ruhf's testimony and Corporal Peters' testimony. Corporal Peters' testimony, as well as his police report, demonstrates that Iggy had alerted to the presence of drugs. The fact that Iggy did not indicate in this case does not detract from the alert behavior observed by Corporal Peters, but instead shows that for whatever reason Iggy was not able to locate the source of the drugs. It is undisputed that Corporal Peters and Iggy are a trained, certified, and reliable drug detection canine team. Once Corporal Peters informed Trooper Knott that Iggy had alerted to the presence of drugs, combined with the observations indicating that criminal activity may be afoot already observed by Trooper Knott, we find that probable cause to seize and search the vehicle existed.

### D. The Inventory Search of the Vehicle

Mr. Johnson also argues that the Inventory Search of his vehicle was nothing more than a pretext to further Trooper Knott's criminal investigatory search and therefore was illegal.

Conducting an Inventory Search is an exception to the general rule that a search performed without prior approval of a judge or magistrate, are per se unreasonable under the Fourth Amendment. United v. Mundy, 621 F.3d 283, 287 (3rd Cir. 2010). When an Inventory Search is conducted pursuant to standard police procedures it is reasonable. South Dakota v. Opperman, 96 S.Ct. 3092 (1976). But an inventory search may not be conducted only as a "a ruse for general rummaging in order to discover incriminating evidence." Florida v. Wells, 110 S.Ct. 1632 (1990).

In this case we have already determined that Trooper Knott had probable cause to search Mr. Johnson's vehicle before he decided to apply for a search warrant. As such, the inventory

search could not be a violation of the Fourth Amendment since Trooper Knott was already authorized to conduct the search without a warrant.  <u>Arizona v. Gant</u>, 566 U.S. 332, 247 (2009).

### E. <u>Franks</u> Argument

Mr. Johnson argues that the search warrant in this case contains materially false statements or reckless omissions of fact rendering the warrant invalid under <u>Franks v. Delaware</u>, 438 U.S. 154, 155-56 (1978).  "The Fourth Amendment prohibits the intentional or reckless inclusion of a material false statement (or omission of material information) in a search-warrant affidavit."  <u>United States v. Pavulak</u>, 700 F.3d 651, 665 (3d Cir. 2012), citing <u>United States v. Yusuf</u>, 461 F.3d 374, 383–84 (3d Cir. 2006).

A defendant may be entitled to a <u>Franks</u> hearing if he is able to make a "substantial preliminary showing" that the affiant knowingly or recklessly omitted facts from the affidavit (or included a false statement in the affidavit) and is able to demonstrate that the omitted facts (or false statements) are "necessary to the finding of probable cause."  <u>Pavulak</u>, 700 F.3d at 665, quoting <u>Yusuf</u>, 461 F.3d at 383–84.

The United States Court of Appeals for the Third Circuit has applied <u>Franks</u> to cases where the Defendant alleges that facts have been deliberately or recklessly omitted from a supporting affidavit.  <u>United States v. Frost</u>, F.2d 737, 742-43 & n.2 (3rd Cir. 1993).  More specifically, the Third Circuit Court has explained that "(1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know: and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting."  <u>Wilson v. Russo</u>, 212 F.3d 781, 783 (3rd Cir. 2000).

In addition to finding that the statements were recklessly or knowingly omitted from the affidavit, the court must also determine whether the missing statements were "material, or necessary, to the finding of probable cause." Sherwood v. Mulvihill, 113 F.3d 396, 399 (3rd Cir. 1997). The materiality of the omissions is determined by "excis[ing] the offending inaccuracies and insert[ing] the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause." Wilson, 212 F.3d at 789, citing Sherwood, 113 F.3d at 399.

Mr. Johnson contends that Trooper Knott made several false statements in the Affidavit, that when excised destroys probable cause for the issuance of the search warrant. Specifically, Mr. Johnson points to the following statements in the affidavit:

- That Mr. Johnson was operating a vehicle under an expired rental contract;

- That Mr. Johnson was rambling about Hurricane Sandy, which made no sense in the context of the situation;

- That he detected the strong presence of an artificial fragrance that had been disbursed inside the vehicle just prior to the stop;

- That there was no luggage visible inside the car;

- That Mr. Johnson had responded "no" when asked if had used any other names;

- That Mr. Johnson gave conflicting statements about traveling to Pittsburgh;

- That Mr. Johnson had made an unsafe lane change in "heavy rain conditions"; and

- That Corporal Peters relayed that he observed a positive response from his drug detection dog indicating the odors that he is trained to detect.

D. Br. 24-27.

We can discern no <u>Franks</u> violation.  Trooper Knott stated that Mr. Johnson's rental contracts had expired and that he had rambled about Hurricane Sandy coming into town, which the Trooper stated "made no sense in the context of the situation."  These are not false statements.  Mr. Johnson's rental contracts for the vehicle were in fact expired.  Trooper Knott asked Mr. Johnson about the expired contracts and he did say that it was due to Hurricane Sandy.  The Trooper did not say that Mr. Johnson meant that he could not renew the rental because of Hurricane Sandy, but we cannot say that omission is material or is in any way necessary to a finding of probable cause.

Mr. Johnson further argues that the Trooper recklessly omitted the fact that he eventually learned that Mr. Johnson was lawfully in possession of the rental vehicle, and that Mr. Johnson explained that all he had to do was telephone the company to renew the rental contract.  We cannot say that these omissions would have affected the magistrate's probable cause determination.  The fact that the Trooper's suspicions were raised because Mr. Johnson had two expired rental contracts remains true even though he later found out that the Mr. Johnson properly possessed the vehicle.  In addition, had Trooper Knott stated in his affidavit that Mr. Johnson said he could not reach the rental company because of Sandy and that all he had to do was make a telephone call to renew, this would only support the Trooper's suspicions.  If all Mr. Johnson had to do was make a telephone call there would be no need to even mention Hurricane Sandy.  By the time Trooper Knott found out that Mr. Johnson validly possessed the rental vehicle, his suspicions of criminal activity had progressed beyond his initial question regarding the expired rental contracts.

Next, Mr. Johnson argues that Trooper Knott's statement that he detected the strong presence of an artificial fragrance that had obviously just been dispersed into the cabin of the vehicle just prior to the stop is a false statement. This is what the Trooper believed when he approached the vehicle. He testified that the odor was extremely strong and described it as having just been dispersed into the vehicle. The fact that when he searched the trunk of the vehicle he discovered a bottle of cologne in the trunk, does not change the Trooper's initial suspicion about the strong odor of an artificial fragrance. To correct the alleged false statement and omission here would require a statement to explain that the cologne was found in the trunk and was the cause of the strong odor the Trooper detected when he first approached the vehicle. We fail to see how this would affect the magistrate's determination of probable cause. The critical fact is the strong odor that Trooper Knott's training and experience led him to believe was used to mask the odor of drugs. It simply is not important whether it was dispersed just recently or was the result of a cologne bottle in the trunk: the material fact the Trooper properly relayed in his affidavit was that the strong odor was present when he approached the vehicle.

Mr. Johnson next argues that Trooper Knott's statement that there was no luggage visible inside the car, was misleading because he omitted the fact that luggage was eventually found in the trunk of the vehicle. Mr. Johnson argues that the Trooper recklessly omitted this fact in an attempt to convince the magistrate that Mr. Johnson was traveling without luggage. We disagree. Trooper Knott clearly stated that despite Mr. Johnson saying he traveled extensively, the Trooper did not see any luggage visible inside the vehicle. He reasonably testified that he typically does view some luggage in vehicles in which persons are traveling. The Trooper conveyed to the magistrate facts

that raised his suspicions and this was one of those facts. To correct the alleged omission and include the fact that luggage was eventually found in the trunk would not change the probable cause determination, as the luggage was found long after the Trooper's suspicion of criminal activity was raised, in part, by the fact that this person who stated they were traveling extensively had no luggage visible in the vehicle.

Mr. Johnson also argues that the Trooper gave an untrue statement in his affidavit when he stated that Mr. Johnson had responded "no" when asked if had used any other names. In fact, the evidence presented at the hearing shows that Mr. Johnson initially did deny that he had used other aliases. To include the fact that Mr. Johnson eventually admitted his use of aliases would only strengthen probable cause as it would establish that Mr. Johnson had lied to the Trooper earlier in the encounter.

Mr. Johnson next argues that it was misleading and untrue for Trooper Knott to state in the affidavit that Mr. Johnson had given conflicting statements about traveling to Pittsburgh. This issue was extensively addressed during the hearing with both Trooper Knott and Corporal Peters. Trooper Knott testified that when he asked Mr. Johnson about his travel plans, he said he was going to Pittsburgh to buy alligator boots. When Corporal Peters questioned Mr. Johnson, he told Corporal Peters about about his other businesses, where he had been traveling, and that he had family in Pittsburgh. The fact that Mr. Johnson did not tell Corporal Peters that he was traveling to Pittsburgh to buy alligator boots - the sole reason he offered to Trooper Knott – was an indication to Trooper Knott that he had given conflicting statements about his plans. While it is true that a person can have family in Pittsburgh and be traveling to Pittsburgh to buy boots,

the salient fact in Trooper Knott's determination was that this individual was not giving a consistent answer. Had he included additional information about the details of what Mr. Johnson had told Corporal Peters in comparison to what he told Trooper Knott it would not change the probable cause determination.

Next, Mr. Johnson argues that Trooper Knott had made an unsafe lane change in "heavy rain conditions." Our review of the video shows that it did not appear to be "heavy rain conditions," but the subjective view of Trooper Knott that Mr. Johnson had made an unsafe lane change is not a false statement. Again, there was extensive cross-examination of Trooper Knott on this issue. The defense appeared to be attempting to show that because Trooper Knott did not apply his brakes when Mr. Johnson changed lanes, that he was overstating the danger of the lane change maneuver. Trooper Knott consistently testified that Mr. Johnson did not give enough space between himself and Trooper Knott's vehicle when he made the lane change and that Trooper Knott was forced to slow his vehicle in a defensive manner in order to increase the distance between the two vehicles. We see no problem with the Trooper's statement in the affidavit. He always felt that the lane change was unsafe. Were we to remove the mistaken description of the weather conditions as "heavy rain" it would not change the salient fact that the Trooper viewed the lane change as unsafe. Finally, Trooper Knott did not decide to make a traffic stop because of the unsafe lane change; he had decided to make the stop based on Mr. Johnson's traveling in the left hand lane for an extended time without a lawful reason.

The last statement in the affidavit that Mr. Johnson singles out is Trooper Knott's statement that Corporal Peters relayed that he observed a positive response from his drug detection dog indicating the odors that he is trained to detect. Mr. Johnson argues that this statement is misleading, in part, because Trooper Knott used the word "indicating," which when used in reference to a drug detection dog means that the dog "indicated," or located drugs. He argues that this is misleading given that Trooper Knott knew that Iggy had not "indicated." We disagree. First, this argument assumes that the magistrate is attuned to the technical use of the term "indicate" such that he would ignore the content of the rest of the sentence that clearly stated the canine handler observed a positive response from Iggy for the odors he is trained to detect. Again, the salient point the Trooper is relaying to the magistrate is not misleading. As discussed above Iggy did alert to the presence of odors he is trained to detect.

As we have stated, a defendant may be entitled to a <u>Franks</u> hearing if he is able to make a "substantial preliminary showing" that the affiant knowingly or recklessly omitted facts from the affidavit and is able to demonstrate that the omitted facts are "necessary to the finding of probable cause." <u>Pavulak</u>, 700 F.3d at 665, quoting <u>Yusuf</u>, 461 F.3d at 383–84. The Affidavit of Probable Cause is comprehensive and includes the facts as they arose to during the course of the traffic stop that raised Trooper Knott's suspicion that criminal activity was occurring. To the extent that any fact was omitted or an untrue statement was included we find that it would not eliminate probable cause. We further find that the affidavit in this case properly supported probable cause.

A search warrant may only be issued if there is probable cause to believe that evidence of criminal activity will be found on the premises or person to be searched.  United States v. Harris, 482 F.2d 1115, 1119 (3d Cir. 1973).  "The duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed."  Gates, 462 U.S. at 236 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).  We find that a neutral detached magistrate reviewing the affidavit in a common sense manner and considering all the circumstances would conclude that probable cause had been established based on the numerous indicators set forth by Trooper Knott.  Indeed, as we have already found, probable cause had been established during the traffic stop to allow Trooper Knott to conduct a warrantless search of the vehicle.

## IV.  Conclusion

We find that the initial traffic stop of Mr. Johnson's vehicle was justified based on the Trooper's observation of a traffic violation.  We further find that length of the stop was reasonable based on the need to verify Mr. Johnson's identity and his possession of the vehicle, and due to Trooper Knott's continuing investigation to either confirm or dispel his suspicion of criminal activity.  We also find that the Corporal Peters' drug detection canine Iggy alerted to the presence of drugs in the vehicle.  Once it was determined that Iggy had alerted, we conclude that Trooper Knott had probable cause to seize and search the vehicle without a warrant.  Finally, we find that probable cause did exist for the issuance of the search warrant, and that there was no Franks violation.

Accordingly, Defendant Zavia Johnson's Motion to Suppress Evidence Obtained as the Result of an Unlawful Search and Seizure (ECF No. 22) and his Supplemental Motion (ECF No. 31) be and hereby are DENIED.

A pretrial conference is set for the Erie May Term of Court, which begins on May 4, 2015, to be followed by jury selection and a jury trial.

IT IS FURTHER ORDERED that motions in limine as well as motions addressing pretrial legal issues are due no later than April 13, 2015. Responses to any such motions are due by April 27, 2015. Proposed voir dire and points for charge are due no later than April 26, 2015.

Date: _March 30, 2015_

_Maurice B. Cohill, Jr._
Maurice B. Cohill, Jr.
Senior United States District Court Judge